Marshall, C. J.
The demurrer of course admits the truth of all issuable facts alleged in the petition ' as herein set forth, and thereby raises several important legal questions. It is urged in briefs filed amici curiae that this proceeding in prohibition cannot be maintained in its present form for three reasons:
(a) A taxpayer of the city of Cincinnati is not beneficially interested within the meaning of Sections 4311 to 4314, inclusive, General Code.
(b) That certain conditions precedent to the filing of such a suit have not been complied with..
(c) That there are other remedies available.
*45 In view of the conclusions we have reached upon other larger questions in the case, it is not necessary to consider or decide these propositions, and, for reasons not necessary to discuss, we do not deem it expedient to do so. The major question before the court pertains to the validity and constitutionality of Section 6 of the act of April 29, 1921 (109 Ohio Laws, 354), as follows:
“The power and jurisdiction conferred upon the superior court óf Cincinnati by virtue of Section 15098 of the General Code is hereby terminated and abolished, and the same is vested in the court of common pleas of the county in which said superior court of Cincinnati is located.”
The argument upon that proposition is based upon four propositions:
(1) Section 6 is unintelligible and meaningless;
(2) Section 6 is unconstitutional, not being in conformity with Section 16, Article II of the Constitution ;
(3) Section 6 is unconstitutional, not being in conformity with Section 4, Article IY of the Constitution ;
(4) Section 6 is unconstitutional in that it impairs the obligations of contracts.
These propositions will be considered in their order; but, as preliminary to a discussion of them, it should first be stated that in the case of Walker, City Solicitor, v. City of Cincinnati, 21 Ohio St., 14, 8 Am. Rep., 24, the original act of May 4, 1869, in all its provisions, has been established as constitutional and valid beyond further discussion.
1. Is Section 6 unintelligible and meaningless, in the sense that it is not valid, binding legislation *46 imposing any obligation upon the other branches of our state government?
This inquiry does not require that we should determine whether Section 6 is within the powers conferred upon or prohibited to the Legislature. It only makes it necessary to determine whether that section is so imperfect as to render it impossible of execution, and whether it is so deficient in its details as to make it impossible of enforcement, and whether it is so uncertain and indefinite as not to indicate the matter or thing to which it relates, or the purpose to be served. If it is capable of being understood and if it expresses a definite legislative purpose, or if a definite meaning and purpose can be given to it in connection with other statutes in pari materia, this court will be transcending its powers in declaring it void for uncertainty. It must be borne in mind that Section 15098, General Code, has not been repealed, and reference may therefore be made to that section to more definitely determine the meaning of Section 6 of the new enactment. By reference to Section 15098 it is plainly discernible that that section gave to the superior court of Cincinnati the power to make appointments to fill vacancies occurring in the board of trustees of the Cincinnati Southern Railway, whether such vacancies occurred by resignation or death. True, that meaning is not full and complete without further reference to Section 15094, General Code; but, both of those sections being in pari materia, there can be no valid objection to making such reference in order to arrive at the complete legislative intent. The Legislature doubtless assumed that, inasmuch as Section 15094 applied more particularly to the crea *47 tion of the full board of trustees at the inception of that organization, and Section 15098 applied more particularly to filling vacancies, it was not necessary to refer to both sections.
It is further urged, however, that there is no Section 15098, General Code. We are wholly unable to agree with counsel upon this point. It is true that there was no such number in the original codification. On the other hand, it will be found that, after the codification was completed in the Seventy-Eighth General Assembly, further authorization was given in the Seventy-Ninth General Assembly, by an act dated March 28, 1911 (102 Ohio, Laws, 46), to further supplement the General Code by adding as an appendix thereto certain acts and parts of acts not included in the General Code, and such as were enacted subsequent to the adoption thereof, as the Attorney General might deem proper, and, acting upon that authority, the Attorney General employed James E. Campbell and Lewis C. Laylin to prepare an appendix to the General Code. The result of their efforts was the inclusion in an appendix of all sections following number 13767. We are of the opinion that the Appendix to the Code, authorized and prepared in the manner already stated, became to all intents and purposes a part of the General Code of Ohio, in the same manner and to the same extent as legislation subsequent to 1910 has become a part thereof. Whether that is technically true or not, that thought was evidently uppermost in the minds of the legislators in 1921 in designating Section 15098 as a part of the General Code, and it would seem to be absurdly technical on the part of this court to declare the abso *48 lute futility of the efforts of the General Assembly on any such grounds. We have no difficulty in determining that the Legislature intended that immediately upon the act of April 29, 1921, -becoming effective the power and authority theretofore reposed in the superior court of Cincinnati to make appointments to fill vacancies in the board of trustees of the Cincinnati Southern Railway should be revoked, and thereafter be reposed only in the court of common pleas of Hamilton county. By reference to Section 15094 it will be seen that the power was conferred upon the superior court of Cincinnati, to be exercised by “the judges thereof,” and it was evidently the intention of the Legislature in the act of May 4, 1869, not to confer the power of appointment upon a single judge. The superior court of Cincinnati was throughout its entire history a court of three judges, and the power conferred by Sections 15094 and 15098 was evidently intended to be reposed in the full court, and it was only natural, and, as we think, necessary, that, when provision was made for the expiration of the term of one or more of the judges without reappointment, thereby reducing the court to a single judge, the power should be lodged in the court of common pleas, in accordance with the original provisions of Section 15094. Indeed, it it doubtful whether there was any necessity whatever for the enactment of Section 6; and it seems quite clear that, if there had been no such enactment, the provisions of Section 15094, in connection with Section 15098, would have fully covered the situation, and would have been ample authority for filing the application in the *49 court of common pleas, as was in fact done by the city solicitor.
The Legislature created the superior court of Cincinnati, and no one has ever questioned the power of the Legislature to create that court; and, having the power to create, it follows that it had the power to abolish it. No counsel in this case has argued to the contrary. Having the power to abolish the court altogether, it also necessarily follows that it had the power to make provision for the exercise of certain jurisdiction by the court of common pleas, which jurisdiction had theretofore been lodged in the superior court. The Legislature may not have adopted the means which counsel or this court might have adopted; but, so long as the purpose is clear, or at least capable of being definitely ascerfained, this court has neither the power nor the disposition to interfere.
While the consideration of this branch of the controversy does not involve constitutional interpretation, there is a strong analogy thereto. It has on many occasions and by every court of last resort in the United States been declared that the courts will not in doubtful cases pronounce a legislative act to be contrary to the Constitution. The basis of that principle lies in the separation of the powers of government into three branches, and the duty of each of the branches not to encroach upon the essential prerogatives of the others. That principle applies with equal force when the courts are called upon to declare a statute to be so meaningless and unintelligible as to be inoperative. The courts should approach the consideration of such questions *50 with the same “cautious circumspection” which involves constitutional questions.
2. Does Section 6 of the act of April 29, 1921 (109 Ohio Laws, 354), contravene Section 16, Article II of the Constitution? On this branch of the inquiry the legislation must be measured by the following language in that section of the Constitution: “No bill shall contain more than one subject, which shall be clearly expressed in its title, and no law shall be revived, or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed.”
A broad definition of the word “amendment” would include any alteration or change; and it must be admitted that some change is effected in Section 35098 by the provisions of Section 6. That is to say, that portion of the section which conferred jurisdiction upon the superior court is so affected as to confer that jurisdiction upon the court of common pleas. Section 15098 was not, however, repealed either expressly or by implication. It is possible that the Legislature may have intended to let that section stand until such time as the superior court of Cincinnati might possibly be revived. Inasmuch as that section still stands upon the statute books, the objections which have been voiced in some of the former decisions of this court that it becomes necessary to look to repealed statutes to ascertain the true meaning of amended statutes is obviated. This case is in all respects similar to Kinsinger v. Board of Education of De Graff Village School Dist., 101 Ohio St., 298, 127 N. E., 874. The law declared in the syllabus in that case clearly controls the in *51 stant case. The facts disclosed in that case were that the Industrial Commission of Ohio had been created and the State Liability Board of Awards had been abolished, and the jurisdiction of the latter transferred to the former, all of which was accomplished without repeal of the statutes in which the change was effected. The decision in that case was the unanimous judgment of this court, and the rule therein declared will be followed in this case.
3. Is Section 6 unconstitutional as contravening Section 4, Article IV of the Constitution? That section provides:
“The jurisdiction of the courts of common pleas, and of the judges thereof, shall be fixed by law.”
It is also urged that any laws fixing the jurisdiction of courts of common pleas must be laws of a general nature and have uniform operation throughout the state. It is true that Section 6 is limited in its application to Hamilton county, although no particular county is specifically named in the section; but that result necessarily follows from the language, “in which said superior court of Cincinnati is located.” If there were other cities in other counties throughout the state having a superior court, and if Section 15098, General Code, could have any possible application to any other court than the superior court of Cincinnati, or if there were any facts, circumstances, and conditions to which more general language could have had any possible application, there would be much force to the contention of counsel upon this point. It being undisputed, however, that there is no other superior court in the state of Ohio, and no other railroad owned by a municipality under the authority conferred by the *52 act of May 4,1869, and there being clearly no other circumstances or conditions upon which more general language could possibly operate, a different question is presented. There being no other county or city or superior court or condition or thing of value upon which general language could operate, the objection becomes a purely technical one. If Section 6 were creating new rights and interests, instead of merely making an 'adjustment of existing rights and interests to new conditions, the questions presented would challenge the serious attention of this court. But, inasmuch as the property rights and interests which are the subject-matter of this controversy owe their existence to legislation which has been in effect more than 50 years, which legislation was carefully considered by this court almost immediately after its enactment and pronounced to be valid, the effect of that litigation and the principles therein established should not be lightly esteemed by this court at this late date. Section 4, Article IV, was a part of our Constitution when the legislation of 1869 was enacted. This proposition was before the court in the case of Walker v. Cincinnati, supra, and this particular question was ably argued by Senator Stanley Matthews and Henry Stanbeiy, as will be seen by reference to the briefs appearing on pages 30 to 34, inclusive, and, more particularly, by the opinion of the court in disposing of that feature of the case on page 49. It was foreseen by the Legislature that the superior court of Cincinnati might not always exist, and provision was made for the possible contingency of municipally owned railroads in counties where no superior court might be created. Provision was therefore made in the gen *53 eral legislation of 1869 for the particular contingency which has in fact come to pass.
If the objection urged by counsel upon this point is sound, then the time could never come under any legislation when the court of common pleas would have the power to fill vacancies in the board of trustees of this railroad. This proposition was urged by counsel amicus curiae in his brief, but he must have seen the futility of this position, because in arguing another proposition in his reply brief we find the following statement:
“Section 6 simply ‘accelerates’ the vesting in the court of common pleas of the jurisdiction to appoint the trustees, for upon the final termination of the superior court, when the time will come when there is no superior court, then the court of common pleas will make the appointments.”
We have therefore reached the conclusion that, this situation being a solitary one, and Section 6 being intended merely to tide over the transition period from the date of the act abolishing the superior court until such time as the term of office of the last of the judges of that court should expire, it was not that character of legislation which is to be of a general nature, and, therefore, was not required to have universal application.
4. Does Section 6 operate as an impairment of a contract? It is contended that it violates Section 10, Article I of the Constitution of the United States, the pertinent portion of which reads, “No state shall * * * pass any ' * * law impairing the obligation of contracts,” and, further, that it violates Section 28, Article II of the Ohio Constitution, the pertinent portion of which reads:
*54 “The General Assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts. * * *”
It is claimed by counsel amicus curiae that the grant of power to certain cities in Ohio to acquire and own a railroad, and the appointment of trustees in the manner therein provided, and the further legislation on the part of the states of Kentucky and Tennessee amplifying the Ohio legislation, all have the effect of constituting an inviolable contract, and that Section 6 impairs that contract by taking away from the superior court of Cincinnati the power to fill vacancies in the board of trustees during the transition period between the date of the act whereby the superior court is abolished and the date of the expiration of the term of the last of the judges of that court. It is claimed on the other hand, that the act of May 4,1869, and the further proceedings of the city of Cincinnati, and of the courts, and of the trustees, do not constitute that character of contract contemplated by the federal Constitution; and it is further contended that there is no party to this litigation, nor any one privy thereto, who has any vested interest or property right which can suffer by this legislation. We will first determine whether or not a contract exists within the purview of the above-quoted clause of the federal Constitution.
The earliest and strongest case in which that clause received judicial interpretation was Trustees of Dartmouth College v. Woodward, 17 U. S. (4 Wheat.), 518, 4 L. Ed., 629. There is a wide difference of opinion among counsel as to the applicability of this case as authority in the present contro *55 versy. It is contended by the respondents that it has no application, because, it is claimed, the Cincinnati Southern Railway is owned by the city of Cincinnati, and that city is a public corporation. It is clearly the spirit of the Dartmouth College case that the principles therein declared should apply only to private corporations. This leads to the inquiry as to the distinction between public and private corporations. The distinction is not difficult to discern. Public corporations are such as are established for purposes of government and invested with political powers. Private corporations include all those designed to perform civil functions; and, though certain classes of corporations are empowered to render services for the benefit and advantage of the public, including all public-service corporations, they are nevertheless private, unless empowered to administer civil or municipal authority. A public corporation is regarded as a mere instrumentality of government and a depositary of political power conferred by the Legislature. It can therefore be established, or dissolved, or invested with new powers, or deprived of those which it previously possessed, at the will of the Legislature. Neither the Darthmouth College case nor any other respectable authority ever declared a contrary doctrine. The Supreme Court of the United States has many times so declared. A leading case on this subject is that of City of Covington v. Kentucky, 173 U. S., 231, 19 Sup. Ct., 383, 43 L. Ed., 479, from which we quote:
“A municipal corporation is a public instrumentality, established to aid in the administration of the affairs of the State, and neither its charters, nor any *56 legislative act regulating the use of property held by it for governmental or public purposes, is a contract within the meaning of the Constitution of the United States.”
These principles are so clear and so well settled that this branch of the case could easily be disposed of if it was clear that the city of Cincinnati owned and operated this railway in a governmental rather than in a proprietary capacity.
It is well settled that a municipal corporation has a dual capacity, the one governmental, or public, the other proprietary or private. In all those matters where it performs its governmental functions as an agent of the state its powers may be changed or revoked without impairment of any constitutional obligation; but when acting in its proprietary capacity it is entitled to constitutional protection. In such case it stands in all respects on the same footing as any private corporation exercising similar franchises. In owning and operating a railroad the city of Cincinnati is engaged in a business undertaking for profit, and therefore subject to the same rules, and entitled to the same constitutional guaranties, as any private corporation.. This principle has been declared in a long line of authorities, which may not be analyzed or discussed, or even cited, within the reasonable limits of this opinion, but same will be found in Dillon, Municipal Corporations (5th Ed.), page 181, Section 109; Cooley’s Municipal Corporations, page 376, Sections 115-117, and 14 Corpus Juris, 76.
Corporations, public and private, in Ohio are the creatures of legislation, and legislation on this subject is authorized and regulated by Article XIII of *57 the Ohio Constitution. Section 2 of that article makes provision for all corporations other than municipalities. Section 6 makes provision for municipal corporations. It was the spirit of the Dartmouth College case that the charter of any private corporation is a contract between the state and the corporation, the obligation of which may not be impaired by alteration, amendment, or repeal of such charter without the consent of the corporation. Justice Story, who concurred with the opinion of the Chief Justice in that case, made the suggestion of a reservation of legislative power of alteration or repeal as a means of obviating the rigor of the majority opinion. Many of the states of the Union immediately adopted that suggestion, and the provision of Section 2, Article XIII, is the Ohio expression of the adoption of that suggestion. It states in that section :
‘ ‘ Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed.”
It will be found by reference to Section 6, Article XIII, that no such reservation was made relating to public corporations, doubtless out of recognition of the rule that no such reservation was necessary. Tt may be assumed that the framers of Section 6 had in mind the rule declared by this court on that subject in the case of Town of Marietta v. Fearing, 4 Ohio, 427. From the opinion at page 432 we quote :
“In the case of Dartmouth College v. Woodward, 4 Wheat., 518, the Supreme Court of the United States held that a private corporation is a contract between the government and the corporation, and the Legislature cannot repeal, impair, or alter the *58 rights and privileges conferred by the charter, against the consent, and without the default of the corporation, judicially ascertained and declared. But a public corporation, created for the purposes of government, cannot be considered as a contract. We adopt the rule laid down by the late Chancellor Kent upon this subject. (2 Kent’s Com., 245.) ‘In respect to public corporations, which exist only for public purposes, as counties, cities, and towns, the Legislature, under proper limitations, have a right to change, modify, enlarge, or restrain them, securing, however, the property, for the uses of those for whom it was purchased.’ ”
That decision was rendered under the Constitution of 1802, under which the Legislature might grant special charters to private corporations. Under the above-quoted provisions of the Constitution of 1851 any private corporation thereafter organized is subject to the reserved power in the Legislature to alter or repeal. The Cincinnati Southern Railway was authorized under general laws, and those laws must be held subject to the usual legislative processes so long as those processes do not amount to taking of property without due process.
It only remains for us to inquire whether any party or privy to this litigation has vested interests or property rights which are being transgressed. The city of Cincinnati is not a party, but the city appears in the action by its solicitor, and by the allegations of the petition the city through its solicitor has made application to have the appointment made by the common pleas judges, and we will assume, by reason of the relator being a citizen and taxpayer of Cincinnati, that the rights and interests of the *59 city and the rights and claims of the trustees arc properly before this court for determination. Nowhere in the petition is it alleged, and nowhere in the briefs of counsel for relator is it claimed, that the city or its taxpayers would suffer financial loss or damage if this vacancy should be filled- by the judges of the court of common pleas. Any complaint, express or implied, on the part of the city of Cincinnati may therefore be eliminated from this controversy.
It is the basis of the claim on the part of the board of trustees that it has a triple obligation: First, on behalf of the city; second, on behalf of the bondholders; third, on behalf of the lessee. The claims of the trustees may be very briefly disposed of. They have no vested property rights. They stand in the relation of officers of a private corporation, whoso rights are fixed by statute, which rights are incidental to their office. They make no claims as individuals. It would seem to require no logic to support this view. The status of the trustees of this property was considered and declared in the case of Walker v. Cincinnati, supra, in the following unmistakable language:
“We think it unnecessary to inquire whether the trustees provided for by the act are in any sense a corporation or not. For if they are an association or organization of any kind whatever, having a property interest in the road distinct from that of the city, then the objection is well taken. The inhibitions of this section are not directed against names. But it is clear that the trustees are a mere agency through which the city is authorized to operate for its own sole benefit. Neither as individuals *60 nor as a board have they any beneficial interest in the fund which they are to manage, or in the road which they are to build. They are in fact, as well as in name, but trustees, and the sole beneficiary of the trust is the city of Cincinnati.”
We must therefore conclude that the trustees as such have no vested interests or property rights in Section 15098 which are beyond the reserve power of the Legislature to alter or repeal.
We have reached the conclusion that this enterprise was authorized under a law of a general nature, which has been declared valid by this court, and which decision has been acquiesced in for more than a half century, and that that legislation was enacted under a reservation of power to alter and amend the same, and that, so far as the present act of the Legislature abolishing the superior court of Cincinnati operates as an alteration of the act of May 4,1869, it does not transcend the constitutional authority in that behalf. The writ of prohibition will therefore be denied.

Writ denied.

Wanamakeb, Matthias, Day and Ahlbn, JJ., concur.
Robinson and Jones, JJ., concur in propositions 5, 6 and 7 of the syllabus, and in the judgment.